IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

**FILED**

KENT G. SAVAGE
    Plaintiff

JAN 2 9 2019

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____NV_____,DEPUTY

v.

CIV - 15 - 1194 - HE

MARY FALLIN, et al.,
    Defendants.

---

## PLAINTIFFS RESPONSE TO DEFENDANTS PATTON, ALLBAUGH, BRYANT AND WHITTEN'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Pro Se
Kent Savage   #646862
Unit ES - 111
North Fork Correctional Center
1605 East Main Street
Sayre,  OK   73662

Defendants Attorneys
Kari Y. Hawkins
Richard N. Mann
Assistant Attorneys General
313 N.E.  21st Street
Oklahoma City,  OK   73105
Telephone:  (405) 521 - 3921
Email: Kari.Hawkins@oag.ok.gov
Email: Richard.Mann@oag.ok.gov

# Table of Contents

STATEMENT OF THE CASE ..................................................................................... 1

DISPUTE WITH DEFENDANTS' STATEMENT OF FACTS ...................................... 3

STANDARD FOR SUMMARY JUDGMENT ............................................................. 15

PROPOSITION I.......................................................................................................... 16

    PLAINTIFF EXHAUSTED HIS AVAILABLE ADMINISTRATIVE REMEDIES.................. 16

        ODOC'S Grievance Process.......................................................................... 17

        Plaintiff's Grievances ................................................................................... 17

PROPOSITION II ........................................................................................................ 19

    PLAINTIFF'S EIGHTH AMENDMENT CLAIM AGAINST DEFENDANTS BRYANT AND
    PATTON SHOULD NOT FAIL........................................................................... 19

PROPOSITION III ....................................................................................................... 24

    PLAINTIFF'S CLAIMS ARE NOT MOOT IN RESPECT TO SPECIFIC PENITENTIARIES
    ................................................................................................................................ 24

PROPOSITION IV ....................................................................................................... 25

    PLAINTIFF'S HAS STANDING TO SUE FOR DECLARATORY OR INJUNCTIVE
    RELIEF. ................................................................................................................. 25

PROPOSITION V ........................................................................................................ 28

    PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF MUST CONTINUE ........................... 28

PROPOSITION VI ....................................................................................................... 28

    PLAINTIFF'S DECLARATORY JUDGMENT CLAIM MUST CONTINUE ............................ 28

PROPOSITION VII ...................................................................................................... 29

    DEFENDANTS BRYANT AND PATTON ARE NOT ENTITLED TO QUALIFIED
    IMMUNITY............................................................................................................. 29

PROPOSITION VIII...................................................................................................... 29

    COURT SHOULD EXERCISE JURISDICTION OVER PLAINTIFF'S INTENTIONAL
    INFLICTION OF EMOTIONAL DISTRESS CLAIM................................................ 29

CONCLUSION............................................................................................................. 30

## Table of Authorities

**FEDERAL CASES**

Albert v. Sheriff of Harris County, Texas, 937 F.2d 984, (5th Cir. 1991) ........... 21

Benefield v. McDowall, 241 F.3d 1267 (10th Cir. 2001) ................................. 20, 25

Boretti v. Wiscomb, 930 F.2d 1150 (6th Cir. 1991) ............................................... 20

Brown v. Plata, 563 U.S. at 503-504 ..................................................................... 23

Celotex Corp. v. Catrett, 477 U.S. 317, (1986) ..................................................... 15

Clem v. Lomeli, 566 F. 3d 1177, 1181-82 (9th Cir. 2009) ................................. 26

DeSpain v. Uphoff, 264 F.3d 965, 974 (10th Cir. 2001) ...................................... 22

Farmer v. Brennan, 511 U.S. 825,  114 S.Ct 1970 (1994) .......... 20, 21, 25, 26, 28

French v. Owens, 777 F.2d 1250, 1254 (7th Cir. 1985) ........................................ 21

Goka v. Bobbit, 862 F.2d 646, 651 (7th Cir. 1988) ............................................... 26

Green v. Mansour, 474 U.S. 64, 68 (1986) ............................................................ 29

Haines v. Kerner, 404 U.S. 519, 520-21 (1972) .................................................... 16

Helling v. McKinney, 509 U.S. 25,  113 S.Ct 2475 (1993) ............................. 20, 25

Hobbs v. Lockhart, 46 F.3d 864, 866, 869 (8th Cir. 1995) .................................. 25

Hope v. Pelzer, 536 U.S. 730,  122 S.Ct 2508 (2002) .......................................... 20

Hudson v. Palmer, 468 U.S. 517,  104 S.Ct 3194 (1984) ................................... 20

Jackson v. Cain, 864 F.2d 1235 (5th Cir. 1989) .................................................... 20

Kikumura v. Osage, 461 F.3d 1269, 1283 (10th Cir. 2006) ............................. 4, 19

LaMarca v. Turner, 995 F.2d at 1542 .................................................................... 21

Lewis v. Casey, 116 S.Ct 2174, 2178 (1996) ........................................................ 27

Martinez v. Aaron, 570 F.2d 317, 318-19 (10th Cir 1978) ...................................... 2

New England Mut. Life Ins. Co. v. Anderson, 888 F.2d 646, (10th Cir. 1989). 23

Pettigrew v. Oklahoma ex rel. Oklahoma Dept. of Safety, 722 F.3d 1209, 1213,
    (10th Cir. 2013) ................................................................................................ 29

Powers v. Snyder, 484 F.3d 929 (7th Cir. 2007) .................................................. 20

Price v. Wolford, 608 F. 698, 702-03 (10th Cir. 2010) ........................................... 29

Rhodes v. Chapman, 452 U.S. 337,  101 S.Ct 2392 (1981)................................. 20

Rilely v. Olk-Long, 282 F.3d 592, 597 (8th Cir. 2002)....................................... 21

Riley v. Jeffes, 777F.2d 143, 147 (3rd Cir. 1995)................................................. 26

Ross v. Blake, 136 S.Ct 1850 (2016) ...................................................................... 17

Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979) ................................................ 20

Strong v. David, 297 F.3d 646,650 (7th Cir. 2002)................................................. 19

Tafoya v. Salazar, 516 F.3d 912, 918 (10th Cir. 2008)........................................ 22

Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977)................................................... 21

Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005)............................................ 21

Wilson v. Seiter, 501 U.S. 294, 111 S.Ct 2321 (1991) ........................................ 20

## FEDERAL STATUTES

28 U.S.C. § 1367........................................................................................................ 29

28 U.S.C. § 1915........................................................................................................... 2

42 U.S.C. § 1983................................................................................................... 1, 16

42 U.S.C. § 1997..................................................................................................... 16

## RULES

FRCP Rule 15.................................................................................................................. 2

FRCP Rule 56................................................................................................... 1, 15, 16, 23

LCvR 26.3 (a)................................................................................................................ 2

LCvR 56.1.................................................................................................................... 16

IN THE UNTIED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

KENT G. SAVAGE
    Plaintiff

v.                             CIV - 15 - 1194 - HE

MARY FALLIN, et al.,
    Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff pro se with his Response to Defendant's Patton,

Allbaugh, Bryant and Whitten,[1] Defendants' Motion for Summary Judgment (DMSJ).

As stated in 10th Circuit's Judgment and Order, Plaintiff has met the initial

pleading burden. [Doc.No. 18, page 9].  In addition, Defendants' have not provided any

additional information to show "that there is no genuine dispute as to any material fact."

FRCP Rule 56.

### STATEMENT OF THE CASE

Plaintiff Kent Savage is currently in the custody of the Oklahoma Department of

Corrections (ODOC).  At the time the initial complaint was filed, October 22, 2015,

Savage was housed at James Crabtree Correctional Center (JCCC); currently Plaintiff

is being housed at North Fork Correctional Center (NFCC).  After grieving and

appealing the grievance of overcrowding and understaffing in all Oklahoma DOC, but

more distinctively JCCC, [Doc.No. 61-23]; exhausting his administrative remedies,

Plaintiff was able to file a 42 U.S.C. § 1983 complaint.  Complaining that his 8th

---

[1] Defendant Jason Bryant is no longer Warden of the James Crabtree Correctional Center.  Because official capacity claims remained pending against him at the time of his departure, the current warden, Rick Whiten, should be substituted as a party in this action. Fed. R. Civ. P. 25

Amendment rights were and are being violated by DOC. He made mention in his complaint that not only was overcrowding an issue at JCCC but also at all DOC institutions. During the initial screening process required by 28 U.S.C. § 1915, Plaintiff's claims were mistakenly dismissed. However, the Tenth Circuit found, through appeal, that the 8th Amendment claims regarding overcrowding, understaffing and dangerous conditions were valid claims. [Doc.No. 18]. Plaintiff amended his original complaint on November 21, 2016, in compliance with the Court Order and with FRCP Rule 15 in order to add Joe Allbaugh as a Defendant and to clarify other aspects of his complaint.

On 12/12/16 Defendants' waived their right to service of the complaint, giving them 60 days to answer. Plaintiff was barred from seeking discovery until after the Defendants' had answered the complaint and the court had ruled on the Motion to Dismiss. (LCvR 26.3 (a)). When the case was remanded back to the District Court, the court ordered a Special Report. As judicially authorized. Martinez v. Aaron, 570 F.2d 317, 318-19 (10th Cir 1978). The Special Report is prepared by DOC and is therefore slanted in Defendants' favor prejudicing Plaintiff. (Doc.No. 61).

Plaintiff was transferred, (Savage believes out of retaliation), to NFCC from JCCC on 12-22-16.

The Defendants' then filed separate dispositive motions (combined motion to dismiss with motion for summary judgment) for defendant Mary Fallin and defendants Patton, Allbaugh and Bryant on April 7, 2017 (Doc.No. 62 and 63). The Motion for Summary Judgment for Patton, Allbaugh and Bryant was partially denied. (Doc.No. 79)

Attorney Max Hellman entered an Entry of Appearance on August 02, 2017, and then subsequently withdrew on May 30, 2018, without performing any discovery or locating replacement counsel. The surviving claims from Defendants Motion to Dismiss and Summary Judgments are Plaintiff's official capacity claims for injunctive relief against Defendants Allbaugh and Whitten and Plaintiff's individual capacity indifference

2

claims against Defendants Patton and Bryant.  On October 15, 2018, the District Court

issued a Scheduling Order to have discovery completed by November 16, 2018 and

Summary Judgments filed by December 14, 2018.  This gave the Plaintiff less than 30

days to start and complete a difficult and complicated discovery.  Plaintiff requested

additional time for Discovery, but has not heard a response.  Defendants' are now

resubmitting a subsequent Motion for Summary Judgment for Defendants' (DMSJ)

Patton, Allbaugh, Bryant and Whitten.

### DISPUTE WITH DEFENDANTS' STATEMENT OF FACTS

Plaintiff's argument with Defendants' Statements of Facts are presented below.

The numbered items and page numbers refer to Defendants' Motion for Summary

Judgment (DMSJ).

1. Defendants' state, "Plaintiff Kent Savage was transferred from the James Crabtree

   Correctional Center (JCCC) in Helena, Oklahoma to the North Fork Correctional

   Center (NFCC) in Sayre, Oklahoma On December 22, 2016. Special Report

   (hereinafter "S.R."), Attachment 1, pages 18-19."

   *Plaintiff's argument:*  It is true that on December 22, 2017, Savage was

   transferred to NFCC.  However, the 8th Amendment claims are against Oklahoma

   DOC not just JCCC.  When Plaintiff exhausted his administrative remedies he

   included all of DOC, not just JCCC.  Plaintiff was transferred out of retaliation and to

   attempt to moot the claims of this suit. (See DMSJ Proposition III).  In addition, the

   conditions of understaffing and dangerous conditions have been well established

   since the opening of NFCC.  Since the Plaintiff has been housed at NFCC there

   has been numerous violent incidents that were related to understaffing that put

   Plaintiff in harm's way.  Either a more in-depth Special Report needs to be prepared

   or the Plaintiff needs to be afforded proper discovery with counsel. (See Doc.No.

   68-2, Exhibit 2)

3

2. Defendants' state, "At all times relevant to these proceeding, Plaintiff was living on Unit 5 of the JCCC. Doc.No. 1, pages 4, 16, 21 24."

   *Plaintiff's argument:* It is true that Plaintiff resided on Unit 5 for the times identified. However, Plaintiff resided on Unit 4 while at JCCC for a short period of time. And has lived at NFCC since December 22, 2016. (See also item 1 above)

3. Defendants' state: "On August 17, 2015 Plaintiff submitted a Request to Staff ("RTS") to his Unit manager complaining of overcrowding and asking if 'anything can be done to alleviate the problem within the existing budget.' S.R. Att. 23, page 576. In response, Plaintiff was advised that his RTS needed to be 'specific' as to a particular complaint. Id."

   *Plaintiff's argument:* As courts have noted, "the grievant need not lay out the facts, articulate legal theories or demand particular relief.  All the grievant need to do is object intelligibly to some asserted shortcoming." <u>Kikumura v. Osage</u>, 461 F.3d 1269, 1283 (10th Cir. 2006).

4. Defendants' state:  On August 25, 2015, Plaintiff submitted a grievance regarding this issue stating that the RTS response was 'double talk' and demanding an answer. Id at page 577-578. The Grievance was returned unanswered. Id at 579"

   *Plaintiff's argument:*  Plaintiff also stated; "My statement is clear and specific as is my question" in his grievance.  Also note the response in the "unanswer" to the grievance: "Not an issue that is grievable to the Oklahoma Department of Corrections (i.e., involves private prison misconduct, pending litigation; not within or under the authority and control of the Oklahoma Department of Corrections; no remedy is allowed." This is an answer.  Therefore, Plaintiff was simply completing the exhaustion process.

5. Defendants' state: "On August 31, 2015, Plaintiff appealed the grievance response to the Administrative Review Authority (ARA) but the Appeal was also returned

4

unanswered due to defects.  Id at 580-582. Plaintiff never attempted to correct his initial RTS wherein the Unit Manager requested that he articulate a specific complaint."

*Plaintiff's argument*:  The items stated in the "unanswer" to the appeal state:  10. "Not an issue grievable to Oklahoma Department of Corrections (Private prison property, misconduct (see OP-090124, Sections II. B. 1.), litigation pending, not within/under the authority/control of the Department of Corrections, etc.)" and 11. "More than 1 issue – only 1 issue allowed per grievance/Request to Staff." And 22, "This grievance is unanswerable as there are no time frames specifies for the alleged action(s) to have occurred." {emphasis added}. Was not item 10 part of the original question in the RTS, "whether this is even a grievable issue?" Plaintiff was exhausting the process. As for item 11, a quick review of the original RTS shows that there is only one issue presented.  And as for item 22, the date of the RTS is sufficient.

6. Defendants' state, " On August 17, 2015, Plaintiff submitted a RTS asking how many square feet of unencumbered space each inmate was entitled to enjoy.  S.R. Att. 24, page 584.  In response, Plaintiff was advised that his request need to be specific as to a particular complaint. Id."

   *Plaintiff's argument:*  How much more specific can the Plaintiff be?  This is an issue about "condition of confinement" OP-090124 II. A. 1.

7. Defendants' state, "On August 25, 2015, Plaintiff submitted a grievance requesting an answer to the inquiry about unencumbered space. Id. at 585-586.  In response, to the Grievance, Plaintiff was directed to policies in the prison library. Id at 587"

   *Plaintiff's argument:*  The warden (Defendant Jason Bryant) also made condescending remarks, as if to intimidate Plaintiff from pursuing grievance procedures.

8. Defendants' state, "On September 2, 2015, Plaintiff appealed the grievance response to the ARA, and on September 20, 2015, Plaintiff was informed that he would receive an amended response to his Grievance. Id. at 588 -591."

   *Plaintiff's argument:*  So it appears that the warden was either mistaken about the RTS being frivolous, or intentionally trying to convince or persuade Plaintiff to not continue on with the exhaustion process.  It's also interesting that the letter from the warden was slightly apologetic. Id at 591

9. Defendants' state, "On October 23, 2015, Plaintiff received an amended response to his grievance, wherein he was advised that there was no standard on unencumbered space in an open dorm housing unit.  Plaintiff was also advised that there was not a policy that required a specific amount of square feet per offender. Id at 592"

   *Plaintiff's argument:*  Isn't this ironic.  However, there is a policy. See OP-150205 Attachment A. (S.R. Att. 2, page 26). It states,

   "every room occupied for sleeping purposes by one occupant shall contain at least 70 square feet of floor area and every room occupied for sleeping purposes by more than one person shall contain at least 50 square feet of floor area for each additional occupant.  A habitable room shall not be less than 7 feet in any plan dimension.  International Property Maintenance Code 2006."

10. Defendants' state, "On October 28, 2015, Plaintiff appealed the amended grievance response to the ARA but the appeal was returned unanswered because Plaintiff had been granted relief. Id at 593-595."

    *Plaintiff's argument:*  Just because the ARA puts "relief granted" on the answer does not guarantee that relief has been granted.  If Plaintiff would not have appealed the initial grievance the process would have been incomplete.

11. Defendants' state, "DOC Policy OP-150205 is entitled 'Capacities of Facilities.' S.R. Att. 2, pages 21-27. This policy states that the operating capacity of a prison is

determined by a number of factors and is ultimately establish by the Board of Corrections.  It also states the capacity cannot exceed the occupancy load established by the Oklahoma State Fire Marshal. Id."

*Plaintiff's argument:*  It is true that the DOC OP – 150205 (S.R., Att. 2), states that the operating capacity of a prison is determined by a number of factors and is ultimately established by the Board of Corrections.  However, what are the factors that determine this capacity?  As noted in the Special Report Att. 20 C. Facility Description, [Doc.No. 61-20 bates # 0487] the original capacity of JCCC was 999 but then was increased to 1300 offenders.  What factors allowed this change? or What factors changed?  Was it just because DOC needed the extra room?  Also, in S.R. Att. 2 [Doc.No. 61-2 bates #0022] states, that the ratio's for sanitation facilities … (a)…must be at or below numerical ratios in International Building Code (IBC) 2012 and International Plumbing Code.  JCCC fails to meet these standards as written in DOC's own policy.  See S.R. Attachment 20 (Doc.No. 61-20 bates #0514 - 0515) Standard #'s 4-4137; 4-4138, 4-4139.  This American Correctional Association (ACA) report states that JCCC does not meet these standards.

It is also interesting that on April 3, 2014 and on March 11, 2015, the Fire Marshal shows the Occupant Load at 1113.  The inmate count on 4-3-14 is 1034, and 1192 for 3-11-15, well over the 1113.  (Doc.No. 61-18 pages 452 & 462, respectively).  Note:  Plaintiff attempted to sue Fire Marshal in this instant case but was dismissed due to lack of personal involvement.

12. Defendants' state, "On October 19, 2015, JCCC, had an operational capacity of 1313 and the facility count was 1312. S.R., Attachment 5."

*Plaintiff's argument:* What determined the operational capacity of 1313?  The operational capacity is set by the Board of Corrections, which the Director of DOC is

a part of.  Plaintiff needs proper discovery with counsel to determine what factors contributed to this operational capacity.  (See Exhibit 7)

13. Defendants' state, "On October 23, 2015, the physical capacity of Plaintiff's housing unit was 244 and there were 233 inmates on the unit. S.R., Att. 3, page 29."

*Plaintiff's argument:* The physical Count was 243 not 233 as stated in DMSJ. Plaintiff disagrees with the physical capacity.  This capacity has been changed at least once as noted in item 14 below.  What determined the physical capacity of Plaintiff's housing unit at 244?  Plaintiff needs proper discovery with counsel to determine.

14. Defendants' state, "On February 27, 2017, the operational capacity of JCCC was 1175 and the facility count was 1201. S.R., Att. 6."

*Plaintiff argument:* On February 27, 2017, Plaintiff was housed at NFCC, what is the relevance of knowing what the JCCC facility count was?  However, if the Doc.No. 61-3 and Doc.No. 61-4 are compared to each other, notice the change in "Optimal Capacity" and "Physical Capacity" for JCCC.  They dropped from 999 to 948 and 1271 to 1176, respectively.  Unit 5's "Optimal Capacity" and "Physical Capacity" dropped from 184 to 133 and 244 to 179, respectively.  What caused the drop? Unit 4 and Unit 5 are identical units so why didn't the capacities change for both units?  Plaintiff needs proper discovery with counsel to determine.  In addition, notice the Fire Marshal's report which states that the Occupant Load is 1113 on April 3, 2014 and March 11, 2015. (Doc.No. 61-18, pages 452 & 462).  In addition on the Fire Marshal's 3-11-15 report it indicated that the inmate count is 1192 well over the 1113.

15. Defendants' state, "On February 27, 2017, the operational capacity at North Fork Correctional Center, where Plaintiff is currently housed, was 2610 and the facility count was 1821. S.R., Att. 6."

*Plaintiff's argument:* It is true that NFCC is well below its capacity for the physical facility.  In fact, one unit is currently not being used.  However, it is extremely understaffed or the number of inmates to employee ratio is extremely low.  And NFCC is on a regular basis bring in correctional officers from other prisons to <u>try</u> to fill the void.  See also #29 of this report.  NFCC is not able to appropriately staff the occupied portion of the prison to what or how the prison was designed.

16. Defendants' state, "Each prison at DOC is inspected on a weekly basis. See DOC Policy OP-130107, entitled 'Standards for Inspections' S.R., Att. 12, pages 95-107. Specifically, see Part VIII. A. at pages 103-104."

*Plaintiff's argument:* Just because a DOC OP states that there will be weekly inspection doesn't mean there is one.  Plaintiff can provide several examples of were the DOC policies are not followed by DOC staff. (i.e. OP-060107 I. A. 2. and OP-070202 III. A. 1.) (See Exhibit 1, Plaintiff's Affidavit items # 9 and 10).  These examples are only to show that DOC policies are not always strictly enforced.

17. Defendants' state, "Weekly inspection reports for January 7, 2015-October 2015 for Unit 5 of JCCC where Plaintiff resided consistently indicated, at item 35, that the 'unit does not exceed authorized capacity posted.' S.R., Att. 14, pages 242-413."

*Plaintiff's argument:* Plaintiff does not disagree that the reports state this. However, Plaintiff is aware that the posted capacity of the dayroom (the only posted capacity on unit 5) was updated at least once during is occupancy. In addition, Plaintiff finds it curious that there are approximately 40 weekly reports, yet none of them indicate any need for "Corrective Action." Were there not any repairs that needed to be made in the 40 weeks of inspection?  Or is this just a pointless exercise of having a unit manager fill out and/or sign a pre-filled report for the sake of filling out a report?  See number 19 of this report. See also Exhibit 1, Plaintiff's Affidavit.

18. Defendants' state, "Annual inspections of prison facilities are also conducted by DOC's safety consultant pursuant to DOC Policy OP-130107. S.R., Att. 12. Pages 95-107. Specifically, see part VIII, C, at page 105.

*Plaintiff's argument:* A closer look at this section (OP-130107; VIII C) and there is no mention of "capacity" violations.  Therefore, how can an inspection report be used to judge "capacity" if it is not a standard to check.

19. Defendants' state, "The facility was inspected semi-annually between July 28, 2015 and February 2015 and no capacity violations were noted. S.R. Att. 15, pages 415-441."

*Plaintiff's argument:* Plaintiff does not disagree that the inspections happened. However this inspections does not check for any kind of capacity violations. (If I take my car to be inspected and brakes are not part of the inspections, the cars brakes will not be inspected.)  It is interesting to note that there are several inspection deficiencies that are not caught during the weekly inspections. (i.e. evacuation plans, [Doc.No. 61-15 bates 041]; emergency light in housing unit 5 is missing, [Doc.No. 61-15 bates 0420]; emergency light in housing unit 5 is missing, [Doc.No. 61-15 bates 0426], Excessive combustibles in Units 4 and 5, [Doc.No. 61-15 bates 0438]).  Evidence that weekly inspections mentioned in number 17 are simply busy work; no real inspections occurs.

20. Defendant's state, "DOC Policy OP-130106, entitled 'Environmental Health, Safety and Sanitation Inspections' requires the Oklahoma Fire Marshal to annually inspect DOC facilities. S.R. Att. 17, pages 447-450. See part I. B. 1 at page 447."

*Plaintiff's argument:* No argument.  However, where is the Fire Marshal's report that allows the increase from 1113 on 10/23/15 and 3/11/15 (Doc.No. 61-18, bates page 452 & 462) to 1308 on 10/23/15 (Doc.No. 61-3, bates page 29)?  Plaintiff

10

originally included the State Fire Marshal in this suit, but the Courts dismissed him due to no proof of personal involvement.

21. Defendants' state, "On April 3, 2014, the Oklahoma Fire Marshal inspected JCCC, noted the inmate count and reviewed and approved a proposal to add additional beds. S.R. Att. 18, pages 452-457."

*Plaintiff's argument:* April 3, 2014, is well before Plaintiff arrived at JCCC on August 26, 2014. Plaintiff is not aware of what the proposed additional beds requested was at this date. (It could have been only 2 bunks?). In addition, it is interesting that on 10/23/15, the JCCC count sheet shows the count at 1308, (Doc.No. 61-3, bates page 29), and then on 2/28/2017 the count is 1183 (Doc.No. 61-4, bates page 31), when the Fire Marshalls reports of 04/03/2014 and 03/11/2015 shows that the Occupant load is only 1113. (Doc.No. 61-18 bates page 452 & 462). Where's the Fire Marshal's report that allows the increase from 1113 on 03/11/15 to 1308 on 10/23/15?

22. Defendants' state, "On March 11, 2015, the Fire Marshal conducted an inspection after receiving a complaint of 'overcrowding' and other safety violations. S.R., Att. 18. However, the complaint was deemed unfounded and no violations were noted."

*Plaintiff's argument:* The Fire Marshall did note, "Overcrowding, fights, tobacco and drug problems ..." [Doc.No. 61-18 bates 0460]. His response to this comment was, "I found no fights at institution and saw no evidence of safety violations including ventilation problems..." [Doc.No. 61-18 bates 0461]. However, a closer look at the inspection reports reveals the Inmate count at 1034 and the Occupant Load is 1113. Where is the Fire Marshal getting the Inmate count of 1034 (Id page 452) when on 10-23-15 the count was 1308 (Doc.No. 61-3 page 29) and on 2/28/17 the count was 1183 (Doc.No. 61-4, page 31). This is the only place in the report that attempts to deal with overcrowding, there is no other area within his reports that

deals specifically with number of beds or space per person, or number of plumbing fixtures, etc. In addition, if the fire marshal would have inspected the inmates for black-eyes, instead of looking for fights he would have encountered a few; kind of like I have seen a lot of wrecked vehicles but I have never seen an actual wreck in progress.

23. Defendants' state, "On April 22-24, 2015, a 'Commission on Accreditation for Corrections Standards Compliance Reaccreditation Audit' was conducted at JCCC. S.R., Att. 20 pages 486-541. JCCC met 100% of the audit's mandatory standards. Id. at page 512.

   *Plaintiff's argument:* That at the time Plaintiff filed his petition, ACA (American Correctional Association) Standard #4-4052 could have become mandatory. ACA's Standard #4-4052 states, "The warden/superintendent can document that the overall vacancy rate among the staff positions authorized for working directly with inmates does not exceed 10 percent <u>for any 18-month period</u>." Then the ACA's findings state, "JCCC's vacancy rate (29%) for direct inmate contact positions during the period October 2013 to March 2015 exceeds 10%. Consequently this Standard is deemed non-compliant." Plaintiff filed his petition on 10/2/2015, a full 24 months of being over 10%. This is potentially now mandatory. It is also interesting to note that all of the other items deemed "Non-Compliant" deal with –overcrowding issues. [Doc.No. 61-20 bates 0513 thru 0515]. And since the audit was completed there has been additional inmates added to JCCC. Quite possibly making some of these non-mandatory issues mandatory. Also notice the ACA states that there are areas of only 16 square feet of unencumbered space per occupant. (Doc.No. 61-20 bates 0513). When does this standard become mandatory?

24. Defendants' state,

"Regarding the overall safety of the facility, the audit acknowledged the Mar 29, 2014 homicide of inmate Timothy Dunivan, which occurred prior to Plaintiff's transfer to JCCC. However, it also noted that the homicide did 'not appear to be either gang related or part of a pattern of institutional violence. In fact, the facility has very few incidents of assault or violence....'Id at 489."

*Plaintiff argument:*   Earlier in the same paragraph of the audit it states:

"However, although it could not be proved definitively, the criminal investigation suggested that offender Tate owed significant amounts of money to other offenders for drug and/or gambling debts.  It is believed that offender Tate stabbed offender Dunivan to facilitate his own transfer..."Id

Therefore, DOC identified that they really don't know the reason for the homicide. However, they suspect that Tate owned significant amounts of money "due to drug and/or gambling debts."  Drugs are contraband and gambling is a prohibited activity. If JCCC was appropriately staffed, these contraband items and prohibited activities would not be as abundant and there would be less conflict and maybe Mr. Dunivan would be still be alive.  As is very well documented but not included in the Special Report, there is a large amount of contraband that is confiscated each year that is supplied from over the fence, visitors, and employees.  Therefore, if DOC was properly staffed inmates owing other inmates would be minimized. Plaintiff needs to be allowed the ability for proper discovery with counsel to establish there is a lot of contraband that makes it to the inmate.

25. Defendants' state,

"Regarding staffing at the facility, the audit noted that 'current staffing deployment barely met minimal level of staffing...' Id at 504.  Although the vacancy rate at the facility was 29%, this was not a mandatory ACA standard Id. at 513."

*Plaintiff's argument:*  ACA also states,

"Due to personnel deficiencies, the facility is now operating on two, twelve hour shifts.  Security employees and other key staff are scheduled to work five, twelve hours shifts per week.  While this staffing pattern is helping to manage the current

security understaffing, staffing at minimum levels with the use of extensive staff overtime is not seen by the audit team as a successful plan if utilized for <u>an extended period.</u>" [Doc.No. 61-20 bates 0504; emphasis added]

What is an extended period of time?  How long has JCCC, NFCC and DOC been "staffing at minimum levels"?  ACA then goes on to state, "the Oklahoma DOC Statewide accreditation staff advised the audit team that efforts are underway to address the local staffing issues." Id.  But then since that time DOC has issues several statewide hiring and purchasing freezes due to budget constraints. (Doc.No. 37, Exhibits 2, 9, and 11).  Therefore, DOC has never been able to overcome their deficiency.  As of the date of this filing DOC is still only about 60% staffed.  In addition the turnover rate is 30-40% causing an extremely inexperienced workforce, thereby causing unsafe conditions. (Doc.No. 68-11, Exhibit 11). The Special Report is deficient in this area and is prejudicial and/or Plaintiff needs the opportunity to conduct discovery.

26.27. 28.  Defendants' state, ACA interviewed several inmates concerning overcrowding; Timothy Broadbent, Archie Rachel and Stephen Burnett. [Doc.No. 61-20 bates # 0506 - 0509].  In these instances ACA determined, "population issue...did not cause a substantial effect on offender quality of life so as to affect the audit," "complaints were not supported by facility records nor were they supported by audit team observations," and "the offender's ...crowding concerns...were not supported by facility records nor were they supported by audit team observations," respectively. Id.

*Plaintiff argument*:  All of the inmates interviewed complained specifically about "overcrowding" or about issues related to overcrowding.  It also needs to be remembered that ACA does not arrive unannounced.  There are weeks of preparation for the ACA audit so that the prison can received its accreditation.

(Which is a big deal to penal institutions; however, I'm not really sure why? Need proper discovery, with counsel.)  Consequently, the mold is cleaned up, laundry is well stocked. (See Doc.No. 68-3, Exhibit 3)

27. See item 26

28. See item 26

29. Defendants' state,

> "On February 28, 2017, North Fork Correctional Center where Plaintiff is currently housed was authorized to employ 295 full time staff.  The facility had the budget to fill 225 positions and had 217 positions actually filled.  S.R. Att. 9, pages 57-65."

*Plaintiff argument*:  (Notice, in item 15 above on February 27, 2017, the operational capacity at North Fork Correctional Center was 2610 and the facility count was 1821. SR. Att. 6, page 237" [an increase in the number of inmates]). Out of the 217 positions actually filled, only 154 of those are Correctional Officers (COs).  NFCC is well below the standard. Plaintiff needs to be able to do proper discovery, with counsel, to identify how or what standards are used to calculate the number of FTE for JCCC and NFCC.

As seen by the "Arguments of Statement of Facts, (this document), the information provided in the Special Report is either contradictory and/or lacking in providing enough information to make any determinations, at best. In addition, Plaintiff has not had a fair opportunity for proper discovery with counsel.  Therefore, Plaintiff's claims cannot be dismissed.

## STANDARD FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 (a), summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In

addition, local Rule LCvR 56.1 states, "absent leave of Court each party may file only one motion under FRCP Rule 56."

Courts are required to construe pro se litigants' pleading liberally.  <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972).

## **PROPOSITION  I**

### **PLAINTIFF EXHAUSTED HIS AVAILABLE ADMINISTRATIVE REMEDIES**

Plaintiff would like to gently ask the Court, how many times must the Plaintiff argue this point?  This is at least the third time this issue has been presented to the Court.

As Defendants' stated, pursuant to the PLRA, "no action shall be brought with respect to prison conditions under §1983 of this title, or any other Federal law, by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997 e (a).

Plaintiff has filed several 'Request to Staff's' (RTS) / Grievances / and Grievance appeals; three (3) of which are included the Special Report.  However, Defendants are not disputing these RTS / Grievances / Grievance Appeals.  They are stating that Plaintiff should have exhausted additional remedies pertaining to more of the actual threats.  This is untrue.  If DOC is overcrowded and understaffed thereby bringing about unsafe conditions statewide as alleged in Plaintiff's amended complaint it would stand to reason that any change in confinement, whether at a different prison or in a segregated housing unit, the same unsafe conditions would be present.  The RTS / Grievances / Grievance appeals are sufficient in this instance because as stated in the answer to grievance JCCC 15-167, "Not an issue that is grievable to the Oklahoma Department of Corrections (i.e., involves private prison, misconduct, pending litigation; <u>not within or under the authority and control of the Oklahoma Department of Corrections; no remedy</u>

is allowed)." [Doc.No. 61-23 bates 0579; underlining added].  Therefore no "available"

remedy. <u>Ross v. Blake,</u> 136 S.Ct 1850 (2016).

## ODOC'S Grievance Process

Defendants' identify the basic processes of the grievance process in DMSJ,

beginning on page 10.  However, they fail to identify the tricks and traps that are built

into the process to hinder inmates from completing the process.  Several of these tricks

were employed in this instance to impede the Plaintiff.  Such as using the slow inmate

mail system (because understaffed) to make sure the inmate runs out of time, because

there is no mailbox rule for the inmate. (Doc.No. 61-25, page 604).  Or stating, "relief

granted" when in actuality it has not.  (Doc.No. 61-24, page 587, 592 & 595).  Or giving

a non-sensible unanswer to try to persuade the inmate from continuing. (Doc.No. 61-23,

page 582; Doc.No. 61-25, page 604).  However, Plaintiff was persistent and was able to

complete the process as required by the PLRA.

## Plaintiff's Grievances

Defendants' then go on to state that Plaintiff should have requested protective

custody on page 11 of the DMSJ.  However, Defendants' are mischaracterizing the type

of hazards that Plaintiff is representing in this case.  The unsafe conditions that are

brought about by overcrowding and understaffing are potentially different than if the

Plaintiff had a conflict with another inmate.  A conflict with another inmate is generally

foreseeable. An unsafe condition brought about by overcrowding and understaffing also

includes the foreseeable conflict with another inmate, but also includes threats that are

not as easily foreseen, such as a riot, or sitting in the only available seat in the chow hall

only to find out its empty because it belongs to the biggest meanest inmate on the yard,

etc.

While seeking protective custody is a viable option for some hazards it is not

generally a good option, especially for large numbers of inmates.  As stated in the ACA

audit included in the Special Report, "JCCC's at times houses three (3) offender in a segregation cell designed for two." [Doc.No 61-20 bates 0515]. Then in response to this non-compliant issue Warden Bryant stated, "JCCC will continue to maintain the approved capacity by continuing to communicate with the agencies population office, implementing strategies to reduce the number of offenders requesting for protective custody..." One of the implemented strategies that Warden Bryant implemented was to tell the inmates that if he had more inmates request protective custody than what was available in segregated housing (SHU) he would lock the yard down. Also, as stated in the complaint, quite often inmates would be released out of SHU only after a short time, because space was needed for others. (Doc.No. 37 page 20). Also, every inmate knows that merely being transferred to another yard does not solve the problem. Communication between prisons is very common, therefore threats can and do follow an inmate from yard to yard. (See   Doc.No. 37-45, Exhibit 45)  Once an inmate is labeled as a snitch or rat, life becomes harder no matter where he is housed. Therefore, it is better to handle the issue and put it behind you.  It should also be noted a lot of threats are resolved the inmate way, which usually ends up with, contusions, black eyes, cuts, wounds, etc. And then sometimes things go wrong and there is a Dunivan incident. (See Doc.No. 37-13, Exhibit 13).  Therefore, the Plaintiff needed to weigh his options, when he was threatened, to find the best resolution, which in this instance was not being a "snitch." Plaintiff needs additional proper discovery with counsel to try to ascertain how many reported injuries are caused by "slipping in the shower."  Therefore this Proposition must fail because 1) Plaintiff did exhaust his administrative remedies and 2) the proposed exhaustion of administrative remedies was not a practical option because it would have put him further in harm's way.

Also on page 11-12, of the DMSJ Defendants characterize the nature of Plaintiff's grievances as erroneous, because Plaintiff failed to grieve the proper

violations. However, courts have identified "a grievance need not contain every fact necessary to prove each element of an eventual legal claim." <u>Kikumura v. Osage</u>, 461 F.3d 1269, 1283 (10th Cir. 2006). "A grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories or demand particular relief. All the grievant need to do is object intelligibly to some asserted shortcoming." <u>Strong v. David</u>, 297 F.3d 646,650 (7th Cir. 2002). It is apparent that the Administration of DOC is aware of the overcrowding and understaffing problem as identified in the articles provided with the initial complaint and amended complaint. Director Patton of DOC acknowledged that he is concerned that the understaffing and whether the system was safe for both offenders and staff. (See Exhibit 9 of Amended Complaint Doc.No. 37-9) Director Allbaugh identified the problem again in December 2016 of overcrowding and understaffing DOC wide when he stated, "the numbers are a sobering reminder of how overpopulated and dangerous the state's prison system continues to become." and "We are critically understaffed in facilities that weren't built to house inmates." (Doc.No. 68-11, Exhibit 11). And again in April 2017, Allbaugh stated, "Agency wide we have correctional officer (CO) staffing shortages." (Doc.No. 68-2, Exhibit 2)

For the forgoing reasons, this Court should find that the Plaintiff exhausted his administrative remedies.

### PROPOSITION II

### PLAINTIFF'S EIGHTH AMENDMENT CLAIM AGAINST DEFENDANTS BRYANT AND PATTON SHOULD NOT FAIL.

As Defendants stated there are two components of an 8th Amendment claim, objective and subjective. The objective component has been described as the unnecessary and wanton infliction of pain," "unquestioned and serious deprivations of basic human needs," or of the "minimal civilized measure of life's necessities." <u>Rhodes</u>

v. Chapman, 452 U.S. 337, 101 S.Ct 2392 (1981). A growing list of items that the courts have identified in our maturing society, as basic human needs currently include; food, clothing, shelter, medical care, reasonable safety, warmth, exercise, sanitation, personal hygiene, and sleep. However this list or the definition of these items has the potential to change or grow as our society matures. Id. The line between the wanton infliction of pain and conditions that are merely restrictive or harsh has not been clearly drawn. The malicious and sadistic use of force, even without significant injury, or other treatments that unjustifiably inflict pain or injury or is humiliating or antithetical to human dignity is an 8th Amendment violation. Hope v. Pelzer, 536 U.S. 730, 122 S.Ct 2508 (2002). In Farmer, the Supreme Court emphasized physical harm, or the risk of it. In addition, the Court has held that unsafe conditions that "pose an unreasonable risk of serious damage to [a prisoner's] future health" may violate the 8th Amendment even if the damage has not yet occurred and may not affect every prisoner exposed to the conditions. Helling v. McKinney, 509 U.S. 25, 113 S.Ct 2475 (1993). In addition, numerous decisions have held that conduct can violate the 8th Amendment event if it does not inflict physical injury, (Hudson v. Palmer, 468 U.S. 517, 104 S.Ct 3194 (1984); Powers v. Snyder, 484 F.3d 929 (7th Cir. 2007); Benefield v. McDowall, 241 F.3d 1267, 1272 (10th Cir. 2001), or cause lasting harm. Boretti v. Wiscomb, 930 F.2d 1150 (6th Cir. 1991); Jackson v. Cain, 864 F.2d 1235 (5th Cir. 1989)

Prison officials cannot trade off unconstitutional conditions. If one conditions is cruel and unusual, the fact that other conditions are better will not save prison officials from an 8th Amendment claim. Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979).

The second component of an 8th Amendment claim is the Subjective component. Deliberate indifference is the standard for the subjective component or "that deliberate indifference is the appropriate state of mind required for conditions cases." Wilson v. Seiter, 501 U.S. 294, 111 S.Ct 2321 (1991). Deliberate indifference in 8th Amendment

cases falls somewhere between mere carelessness and intent to cause harm. Therefore, prison officials can be found deliberate indifferent if "the official knows of and disregards an excessive risk to inmate health or safety. Farmer v. Brennan, 511 U.S. 825,  114 S.Ct 1970 (1994).  If officials know that conditions are objectively cruel and fail to act to remedy them, they are deliberate indifferent. Albert v. Sheriff of Harris County, Texas, 937 F.2d 984, 998-99 (5th Cir. 1991).  A defendant need not know the precise nature of the risk to be found deliberate indifferent, as long as he knows that a serious risk exists. Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005).  And if the official does not "take reasonable measures to abate it" or if their actions are "not adequate given the known risk." Rilely v. Olk-Long, 282 F.3d 592, 597 (8th Cir. 2002).

In Farmer,  the Court also held that serious damage to prisoners' future health is actionable.  The harm does not have to be "easily preventable" but they must do what is reasonable, not what is easy.  "It is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm," and did not require proof that the official acted because of the risk.

Deliberate indifference can be shown by "repeated examples of negligent acts which disclose a pattern of conduct or systematic or gross deficiencies in staffing, facilities, equipment or procedures, (French v. Owens, 777 F.2d 1250, 1254 (7th Cir. 1985)), regardless of prison officials' motives. Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977).  In addition, deliberate indifference can apply to "institutional historical indifference" rather than the state of knowledge and the response of a particular individual. LaMarca v. Turner, 995 F.2d at 1542.

Plaintiff has met or satisfied both components of an 8th Amendment claim as stated in his complaint.  Because of overcrowding and understaffing Plaintiff has been deprived of basic human needs which are sufficiently serious. And officials acted with a sufficient culpable state of mind as shown in the complaint and attached exhibits to

satisfy the second component.  The attached exhibits to the complaint are mostly newspaper articles that reported the actual incriminating statements of the Defendants, stating, the Defendants know of the conditions within DOC. In addition, the exhibits attached to this filing show that the Defendants are still aware of the problems.  The Special Report falls short in presenting facts that are not just one sided or prejudicial against the Plaintiff as seen in many of the  instances in the "Dispute with Defendants' Statement of Facts", this document.  In addition, Plaintiff needs to be allowed to do adequate discovery with counsel to ascertain how policy was derived because the policy has changed within the time in question.  Also the ACA Report was prepared in April 2015, there were items that were not considered mandatory back then, that are should be now.  The report eludes to if the conditions continue for an extended period of time the issue becomes mandatory. [Doc.No. 61-20, bates 0513].  Therefore, there needs to be additional information presented in the Special Report or Plaintiff needs to be allowed to complete proper discovery with counsel.  As stated, by the Defendants' in their DMSJ, pages 15, "Whether there is a substantial risk of serious harm depends on "the particular facts of each situation; the circumstances, nature, and duration of the challenged conditions must be carefully considered." DeSpain v. Uphoff, 264 F.3d 965, 974 (10th Cir. 2001). "The length of exposure to the conditions is often of prime importance." Id.     It is true that a prison official 'may be liable for a substantial risk of serious harm to inmates in spite of efforts reasonably calculated to reduce the risk, if he intentionally refuses other reasonable alternatives and the dangerous conditions persist.'" Tafoya v. Salazar, 516 F.3d 912, 918 (10th Cir. 2008).  How long does it take to be considered "persist?"  The record continues to show that Plaintiff's 8th Amendment rights have been and are been violated.  As stated in Plaintiff's amended complaint (Doc.No. 37) pages 31 and 37 Defendants made decisions to overcrowd prisons based on financial reason, not considering safety and well-being of inmates and Plaintiff.

Defendants' state on page 15, "Plaintiff's newspaper articles are inadmissible as evidence pursuant to <u>New England Mut. Life Ins. Co. v. Anderson</u>, 888 F.2d 646, 650 (10th Cir. 1989), and they should not be considered as evidence or as creating an issue of fact at the summary judgment stage pursuant to FRCP Rule 56(c)(2)." This is incorrect. This <u>New England</u> case is distinguishable from this instant case in that the newspaper article presented in the New England case was not presented with a foundation. In other words, the newspaper article would have been admissible evidence if it would have been presented with testimony. As seen in Plaintiff's amended complaint the Defendants were interviewed on TV to collaborate with the newspaper articles. And in addition, the newspaper articles were derived from either news releases or press conferences.

Defendants' then continue on page 16 of the DMSJ to identify the different overcrowding ratios between California and OK. And argue that because Oklahoma is not at the same overcrowding ratios as California that this case lacks merit. However, Defendants fail to mention any statistics concerning understaffing. The idea that 8th Amendment rights can't be violated with understaffing is ludicrous. Since Plaintiff has been housed at NFCC the issue is not so much "overcrowding" as "understaffing." In fact, NFCC is still not close to capacity. However, NFCC is not able to staff the prison adequately or provide staffing as the prison was designed. On page 17 if the DMSJ the Defendants state, "In fact, an independent audit of the ODOC..." It is true that ACA is independent, however Plaintiff would like to remind the Court that DOC pays for the audit and therefore the audit is skewed in their favor. Defendants also state on page 17 of the DMSJ that in <u>Brown v. Plata</u>, the only analysis of overcrowded cell space concerned inmates being held in "telephone-booth seized cages" and a "12 by 20-foot cage for up to five hours awaiting treatment." <u>Brown</u>, 563 U.S. at 503-504. However, in the ACA audit it is mention that there are areas that have only 16 square feet of

23

unencumbered space per occupant. (Doc.No. 61-20 bates 0513).  This is an area of either 2 feet by 8 feet or 4 feet by 4 feet.  A long way from 12 by 20-foot for only 5 hours.

Defendants' state on page 19 of their DMSJ that the court should disregard Plaintiff's allegations that Defendant Patton unconstitutionally exacerbated DOC overcrowding when he transferred state inmates, who were being temporarily housed at county jails, into state facilities.  However, it need to be remembered that the inmates that Patton transferred to the prison where already in state custody.  Transfering the inmates from the local jails, with contracts with DOC to hold DOC inmates, to prison was strictly a financial move and did not take into account the safety of the inmates and Plaintiff.

## PROPOSITION III

### PLAINTIFF'S CLAIMS ARE NOT MOOT IN RESPECT TO SPECIFIC PENITENTIARIES

Defendants imply that Plaintiffs complaint about understaffing, overcrowding and safety issues became moot upon his transfer to NFCC on 12-22-17.  However, this is not so.  Plaintiff stated specifically that the overcrowding issue was abundant throughout all of Oklahoma DOC in his complaint. (See complaint. Doc.No. 37, pages 5 - 9, 11, 21-22).   In addition, DOC included information concerning NFCC in the Special Report and Defendants have made specific statements or allegations about the overcrowding and understaffing at NFCC in Defendants DMSJ, therefore, opening the door or implying that the claim continues to NFCC.  Plaintiff also, exhausted administrative remedies with his original grievances which complained about DOC in general.  He stated in one of his Request to Staff's (RTS) that was used in exhausting his administrative remedies. "The overcrowding and understaffing at JCCC has endangered my health and safety.  All essential services have been adversely affected.  I know this

problem exists at other D.O.C. facilities also." [Doc.No. 61-23 bates # 0576, underlining added].  In addition, Director Allbaugh identified the problem again in December 2016 of overcrowding and understaffing DOC wide when he stated, "the numbers are a sobering reminder of how overpopulated and dangerous the state's prison system continues to become." and   "We are critically understaffed in facilities that weren't built to house inmates." (Exhibit 11).   And so, the claims of overcrowding and understaffing should survive, for any other penitentiary that he has been, or could be transferred to.  And should not become moot just because he has been transferred, because the problem is DOC wide.

## PROPOSITION  IV

### PLAINTIFF'S HAS STANDING TO SUE FOR DECLARATORY OR INJUNCTIVE RELIEF.

The federal courts have long held that unsafe conditions that "pose an unreasonable risk of serious damage to a prisoner's future health" may violate the 8th Amendment, even if the damage has not yet occurred and may not affect every prisoner exposed to the conditions.  "A remedy for unsafe conditions need not await a tragic even".  Helling v. McKinney, 509 U.S. 25, 33,  113 S.Ct. 2475 (1993). Psychological harm is actionable under the 8th Amendment. Benefield v. McDowall, 241 F.3d 1267 (10th Cir. 2001).

The Constitution requires prison officials to provide reasonable safety for prisoners. Farmer v. Brennan, 511 U.S. 825, 844, 114 S.Ct. 1970 (1994); Helling v. McKinney, supra.  Prison officials must protect inmates from assault by other inmates, and from unreasonable hazardous living and working conditions.

A prisoner who is subject to a risk of assault, but is not actually assaulted, can recover damages in certain circumstances. Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir. 2001); Hobbs v. Lockhart, 46 F.3d 864, 866, 869 (8th Cir. 1995)

A prisoner need not wait until an assault has occurred before obtaining injunctive relief. Farmer v. Brennan, 511 U.S. 825 845,  114 S.Ct. 1970 (1994); Riley v. Jeffes, 777 F.2d 143, 147 (3rd Cir. 1995).  The Constitution is violated where the Defendants' know of the danger, or where the threat of violence is so substantial or pervasive that their knowledge could be inferred, yet Defendants fail to embrace a policy or take other reasonable steps which may prevent harm.  Goka v. Bobbit, 862 F.2d 646, 651 (7th Cir. 1988); Clem v. Lomeli, 566 F. 3d 1177, 1181-82 (9th Cir. 2009).  All the requirements for injunctive relief have been met as documented in Plaintiff's amended complaint. [Doc.No. 37].

Plaintiff's amended complaint [Doc.No. 37] is abundantly clear that some type of injunctive relief is needed against the Defendants.  It might be true that Plaintiff was not abundantly clear on page 35 of his complaint, but Plaintiff's complaint taken in its totality is sufficient to satisfy the criteria. As is stated in Plaintiff's complaint the reduction of over overcrowding and understaffing to ease the unsafe conditions for all DOC facilities or wherever Plaintiff is assigned to exist.  A quick review of Plaintiff's amended complaint (Doc.No. 37) shows the following area's where Plaintiff seeks declaratory and injunctive relief.

1) There should be enough officers to monitor the inmates as the facility was designed for. (Doc.No. 37, page 4)

2) Meet the standards as established by law for bathroom / plumbing facilities. (Doc.No. 37, page 4 and 26)

3) Have a physical and mental standard for security officers. (Doc.No. 37, page 4)

4) Have appropriate facilities to house inmates; not in conference rooms, visiting areas or gymnasiums. (Doc.No. 37, page 6)

5) Support staff should not be used as security on a regular basis only in extreme emergencies and short term (hours or days, not weeks, months, or years). (Doc.No. 37, page 6)

6) Have commensurate staffing for the number of inmates. (When operating capacities of inmate exceed 100% staffing needs to be at least at 100%) (Doc.No. 37, page 8)

7) Provide medical care in a suitable area protected from the harsh conditions of Oklahoma weather. (Doc.No. 37, page 17)

8) Ensure law library functions are available and meet the standards set forth by the Supreme Court (See <u>Lewis v. Casey</u>, 116 S.Ct 2174, 2178 (1996)  (Doc.No. 37, page 18)

9) Establish procedures to ensure the essential activities provided by support staff that are necessary for the inmates to address critical issues during staff vacation and sick times. (Doc.No. 37, page 22)

10) Implement procedures to separate the more violent inmates from less dangerous inmates. (Doc.No. 37, page 20)

11) Appropriate training for all staff (security and support staff) (Due to understaffing, there is a high employee turnover rate, leaving lingering staff improperly trained. (See Exhibits 1 - 6, [these exhibits are only given to show examples of improper training; and are not exclusive])

12) Meet the required minimum standards for unencumbered space per inmate (Doc.No. 37, page 25 and S.R. Att. 2, page 26 and S.R. Att. 20, page 513)

13) Meet the required minimum standards for air ventilation.  (See Doc.No. 37, page 26, 29 and S.R. Att. 2 page 448)

## PROPOSITION  V

### PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF MUST CONTINUE

All the requirements for injunctive relief have been met as documented in Plaintiff's amended complaint. [Doc.No. 37].  See also previous Proposition (Proposition V). Plaintiff has met the requirements.

Furthermore, as stated in Plaintiff's arguments against Defendant's Proposition V and in his amended complaint Plaintiff, has met the "initial pleading burden." [Doc.No. 18].  And Defendant has failed to provide additional information to prove otherwise.  As stated, in the 10th Circuits Order and Judgment [Doc.No. 18] on page 11, "Savage 'need not show that a prison official acted or failed to act believing that harm actually would befall an inmate'; but must show 'that the official acted or failed to act despite his knowledge of a substantial risk of harm." Farmer,  511 U.S. at 842.  If a risk is 'expressly noted by prison officials in the past, and the circumstances suggest that the defendant – official being sued had been exposed to information concerning the risk and thus must have known about it,' then a trier of fact may find that the defendant –official had actual knowledge of the risk. Farmer at 842-43. " See also Proposition IV of this brief.

## PROPOSITION  VI

### PLAINTIFF'S DECLARATORY JUDGMENT CLAIM MUST CONTINUE

Even though Plaintiff fails to specifically identify the terms for which he is asking for declaratory judgment on page 34 of his complaint [Doc.No. 37], his complaint amply shows evidence of the legal controversies that exist.  Such as stated in "Count One" of amended complaint, "Defendants have denied or wrongfully condoned the denial of a safe and healthy environment for plaintiff." [Doc.No. 37 page 3].  See also Proposition IV of this brief.

### PROPOSITION VII
### DEFENDANTS BRYANT AND PATTON ARE NOT
### ENTITLED TO QUALIFIED IMMUNITY

As stated in Plaintiffs amended complaint [Doc.No. 37] the Defendants are being sued in both their individual and official capacities.  In addition, Plaintiff is seeking injunctive relief, which is prospective in nature and qualified immunity is not available for claims for prospective relief. Green v. Mansour, 474 U.S. 64, 68 (1986). As set forth in Plaintiff's amended complaint and in this Response to Defendants' Summary Judgment motion, Defendants' violated Plaintiff's 8th Amendment rights and Defendants' are well aware of the clearly established rights that are being violated, as is evidenced by the exhibits attached to the amended complaint.  Patton, Allbaugh, and Dowling (the former warden of JCCC ) have made comments captured in the mentioned documents that clearly identify that they know the Plaintiff's rights are being violated, that the "overpopulated and dangerous" conditions in the State's prison system continues. (Doc.No. 68-11, Exhibit 11) (See also Doc.No. 37 page 28).  This is being deliberately indifferent.

Therefore because Plaintiff has shown or met all the burdens of establishing Defendants' violated Plaintiff's constitutional rights they should not qualify for immunity.

### PROPOSITION  VIII
### COURT SHOULD EXERCISE JURISDICTION OVER PLAINTIFF'S
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

Because Plaintiff's Federal allegations are sound claims and have a high probability of surviving, the court should exercise its right to exercise it supplement jurisdiction for Plaintiff's state law tort claim. 28 U.S.C. § 1367.  "A claim is part of the same case or controversy if it derives from a common nucleus of operative fact." Pettigrew v. Oklahoma ex rel. Oklahoma Dept. of Safety, 722 F.3d 1209, 1213, (10th Cir. 2013), quoting from Price v. Wolford, 608 F. 698, 702-03 (10th Cir. 2010).

## CONCLUSION

For the reasons stated above Defendants' Motion to Dismiss and Motion for Summary Judgment (MD&MSJ) must fail.  As the 10th Circuit Court stated in their Order and Judgment, "Savage has met his initial pleading burden," and "staffing ratios are similar to those at issue in other cases in which courts found Eighth Amendment violations" and "At this preliminary phase, we conclude that Savage has plausibly pled that he is subjected to overcrowding and staffing conditions that pose a substantial risk of serious harm." [Doc.No. 18].  Therefore, Plaintiff has stated a claim upon which relief may be granted.

Defendants' "Statement of Facts" in there Motion for Dismissal and Motion for Summary Judgment" have failed to show the absence of a genuine dispute.  And all of the Propositions presented by the Defendants have been overcome.  In addition, Plaintiff has not been afforded any opportunity to seek proper discovery.

Respectfully Submitted,

_Kent Savage_

Kent G. Savage  #646862
Unit  ES – 111
North Fork Correctional Center
1605 E. Main
Sayre,  OK  73662

## PRO SE LITIGANT'S CERTIFICATE OF MAILING

I hereby certify that on 25th day of January 2019, I mailed the attached document to the Clerk of the Court.  Based on the records currently on file in this case, the Clerk of the Court will transmit a Notice of Electronic Filing to those registered participant of the Electronic Case Filing System.

_Kent Savage_

Kent G. Savage  #646862